# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2014AP974-D |
| COMPLETE TITLE: | In the Matter of Disciplinary Proceedings Against Sarah E. K. Laux, Attorney at Law: |
| | Office of Lawyer Regulation, Complainant, v. Sarah E.K. Laux, Respondent. |

---

DISCIPLINARY PROCEEDINGS AGAINST LAUX

---

| | |
|---|---|
| OPINION FILED: | June 24, 2015 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | |

---

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | |
| COUNTY: | |
| JUDGE: | |

---

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | |
| NOT PARTICIPATING: | ROGGENSACK, C.J. did not participate. |

---

ATTORNEYS:

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   2014AP974-D

STATE OF WISCONSIN          :          IN SUPREME COURT

**In the Matter of Disciplinary Proceedings Against Sarah E. K. Laux, Attorney at Law:**

**Office of Lawyer Regulation,**

          Complainant,

     **v.**

**Sarah E.K. Laux,**

          **Respondent.**

**FILED**

**JUN 24, 2015**

Diane M. Fremgen
Clerk of Supreme Court

ATTORNEY   disciplinary   proceeding.   *Attorney's   license revoked.*

¶1   PER CURIAM.   Pending before the court is a report and recommendation filed on April 23, 2015, by Referee Richard C. Ninneman.   The report recommends that this court accept Attorney Sarah E.K. Laux's petition for consensual license revocation, order her to pay restitution, and revoke her license to practice law in Wisconsin.   Attorney Laux is the subject of a disciplinary proceeding alleging that she committed 23 counts of misconduct in four client matters.   She is also the subject of

28 additional pending Office of Lawyer Regulation (OLR) grievance matters that have not yet been fully investigated by the OLR.

¶2 We wholly agree that both revocation and restitution are appropriate, and we also direct Attorney Laux to pay the costs of this proceeding, which are $4,144.99 as of May 12, 2015.

¶3 Attorney Laux was admitted to practice law in Wisconsin on May 17, 2004. She resides in Mequon. She has not previously been disciplined.

¶4 On April 30, 2014, the OLR filed a complaint against Attorney Laux, alleging six counts of misconduct in a single client matter and requesting revocation and restitution. Attorney Laux retained counsel and filed an answer and, on September 4, 2014, following substitution of the originally appointed referee, Referee Ninneman was appointed. On October 27, 2014, the OLR filed an amended complaint, this time alleging 23 counts of misconduct involving four different client matters.[1]

---

[1] We take judicial notice of the fact that on December 2, 2014, a federal grand jury returned a 33-count indictment charging Attorney Laux with two counts of bank fraud, nine counts of wire fraud, one count of mail fraud, 20 counts of money laundering, and one count of filing a false tax return. The indictment charges Attorney Laux with defrauding four different clients to whom Attorney Laux provided trust and estate advice and to whose funds Attorney Laux gained access through her solo-practice law firm. According to the indictment, Attorney Laux defrauded those clients out of more than $2.2 million in funds that Attorney Laux then converted to her own use. The matter is pending.

¶5  On March 27, 2015, Attorney Laux filed a petition for consensual license revocation pursuant to Supreme Court Rule (SCR) 22.19.[2]  In her petition, she acknowledges that she cannot successfully defend herself against the allegations in the

[2] SCR 22.19 provides:

(1) An attorney who is the subject of an investigation for possible misconduct or the respondent in a proceeding may file with the supreme court a petition for the revocation by consent or his or her license to practice law.

(2) The petition shall state that the petitioner cannot successfully defend against the allegations of misconduct.

(3) If a complaint has not been filed, the petition shall be filed in the supreme court and shall include the director's summary of the misconduct allegations being investigated. Within 20 days after the date of filing of the petition, the director shall file in the supreme court a recommendation on the petition. Upon a showing of good cause, the supreme court may extend the time for filing a recommendation.

(4) If a complaint has been filed, the petition shall be filed in the supreme court and served on the director and on the referee to whom the proceeding has been assigned. Within 20 days after the filing of the petition, the director shall file in the supreme court a response in support of or in opposition to the petition and serve a copy on the referee. Upon a showing of good cause, the supreme court may extend the time for filing a response. The referee shall file a report and recommendation on the petition in the supreme court within 30 days after receipt of the director's response.

(5) The supreme court shall grant the petition and revoke the petitioner's license to practice law or deny the petition and remand the matter to the director or to the referee for further proceedings.

amended complaint, which is attached to her petition as Appendix A. She also acknowledges that she cannot successfully defend herself against the pending grievances, a summary of which is attached to her petition as Appendix B.

¶6 On March 30, 2015, the OLR filed a recommendation supporting Attorney Laux's SCR 22.19 petition. The referee issued a report on April 23, 2015, recommending revocation and restitution. No appeal has been filed in this matter, so our review proceeds pursuant to SCR 22.17(2).

¶7 We revoke Attorney Laux's Wisconsin law license effective the date of this order. The scope of Attorney Laux's misconduct is staggering.

Matter of H.F. and M.F.

¶8 The first six counts of misconduct alleged in the OLR's amended complaint involve Attorney Laux's representation of H.F. and M.F., a married couple who, in 2012, retained Attorney Laux for estate planning. At the time, the clients held over two million dollars in investments in a Wells Fargo Advisor Account. Attorney Laux recommended that the clients sell their investments and purchase a series of annuities from Phoenix Life Insurance Company (Phoenix) and American Equity (American). In late 2012, following Attorney Laux's recommendation, the clients retained a broker and $2,337,365.27 was transferred from the clients' Wells Fargo Advisor Account into a brokerage account.

¶9 Attorney Laux subsequently created an entity called HMFF Investments, LLC (HMFF), for which Attorney Laux was the

4

registered agent.  Attorney Laux informed the clients that HMFF would be the owner of the Phoenix and American annuities.  On January 3, 2013, Attorney Laux had the clients sign a third-party check request for a cash withdrawal from their brokerage account in the amount of $2,184,125.30, payable to HMFF.  In late January 2013, without the clients' knowledge or authorization, Attorney Laux deposited the $2,184,125.30 into a U.S. Bank checking account and money market account, in the name of HMFF.  Attorney Laux was the sole signatory.

¶10  In February 2013, Attorney Laux withdrew $64,125.30 at the clients' request to make gifts to family members.  At some point, $195,000 was withdrawn to pay the clients' taxes.

¶11  On February 6, 2013, Attorney Laux provided the clients with a Proposed Annuity Policy Memorandum (Memorandum) which recommended a list of nine annuities in the sum of $2,120,000.

¶12  In March 5, 2013, Attorney Laux made two $250,000 withdrawals from the U.S. Bank checking account.  Attorney Laux used this money for her own personal or business purposes.

¶13  In April 2013, H.F. passed away.  On June 7, 2013, Attorney Laux met with M.F. and her son, Mark, regarding the purchase of annuities listed in the February 6, 2013 Memorandum. At the meeting, Attorney Laux made several misrepresentations, including that:  (1) she had purchased three $250,000 annuity contracts for M.F. in March, April, and May 2013, totaling $750,000, and the contracts were locked in a safe in her office; (2) after the clients' stock portfolio was liquidated, funds of

5

about $2,100,000 were transferred from the brokerage account to two annuity companies, Phoenix and American, and the companies were holding the funds in a bank account until the annuities were purchased as per the Memorandum; (3) the annuities would not "kick in" until 12 months after purchase and a lock or hold would be placed on the accounts during that time, so they would not be available to M.F.; and (4) M.F. would not be able to access her account until the lock or hold period was over. Attorney Laux also falsely stated that the Phoenix policy paid an eight percent bonus.

¶14 After the meeting, M.F.'s son contacted Phoenix and American. Both companies informed him that they do not hold customer funds in an account or bank until the purchase of annuities and do not deny access to customers. M.F.'s son subsequently called Attorney Laux and demanded to see the three annuity contracts.

¶15 The next day, Attorney Laux met with M.F. and her son and again falsely informed them that she had purchased annuities for M.F.; she provided them with three false Contract Specification documents with certain policy numbers. Attorney Laux also falsely informed M.F. and her son that the $2,184,125.30 had been deposited into a U.S. Bank Account in the name of the clients, under HMFF, using the funds from the stock portfolio liquidation.

¶16 After the June 8 meeting, Mark learned that the policy numbers existed but were not in M.F.'s name; Attorney Laux was the agent of record. Mark also learned from U.S. Bank that his

6

parents did not hold any accounts with U.S. Bank; Attorney Laux was the holder of the HMFF account at U.S. Bank.

¶17 On June 11, 2013, Mark contacted Attorney Laux and directed she not purchase any annuities in his mother's name until things were cleared up. Attorney Laux agreed to a meeting at M.F.'s home. There, Attorney Laux informed M.F. and her son that she had, without M.F.'s knowledge or permission, taken hundreds of thousands of dollars from the HMFF account, which she used for her own personal and business expenses. Attorney Laux admitted that she began making withdrawals to herself from the clients' account beginning in March 2013 and that she had committed fraud. Attorney Laux also admitted that she did not purchase $750,000 in annuities for M.F., contrary to her previous statements. Attorney Laux provided M.F. with five U.S. Bank cashier's checks, all dated June 11, 2013, as follows: $250,000 to Phoenix; $250,000 to Phoenix; $250,000 to American; $250,000 to American; and $90,827.21 to American. Attorney Laux also falsely informed M.F. that the purchase of a Phoenix annuity in the amount of $250,000 was in progress and could not be stopped.

¶18 The next morning, just prior to another meeting with M.F. and her son, Attorney Laux went to a U.S. Bank location and withdrew $84,172.79 from the checking account. She then went to another U.S. Bank location and withdrew $822.23 in cash from the money market fund. This zeroed out both accounts.

¶19 That same day, Attorney Laux, M.F., and M.F.'s son met at a U.S. Bank branch location, cancelled the five bank checks

7

written out to Phoenix and American, and obtained a cashier's check in the amount of $1,090,827.21, made payable to the HMFF Transitional Trust and M.F.

¶20 A couple days later, Attorney Laux forwarded an application, with M.F.'s signature, for a $250,000 Phoenix annuity for M.F. On June 18, 2013, a Needs Assessment was faxed to Phoenix with changes initialed "MF." M.F. denies that her signature is on the annuity application or that she initialed the Needs Assessment.

¶21 On June 12, 2013, M.F.'s son alerted the Milwaukee office of the Federal Bureau of Investigation of Attorney Laux's conduct. Attorney Laux was criminally charged and the matter remains pending as of the date of this decision. Mark also filed a grievance against Attorney Laux with the OLR.[3]

¶22 In her petition, Attorney Laux does not contest, for purposes of this disciplinary proceeding, that she converted $584,995.02 from M.F. and H.F. for her own personal and business purposes.

---

[3] On August 14, 2013, Mark filed a complaint against Attorney Laux on his mother's behalf with the Wisconsin Office of the Commissioner of Insurance (OCI). Attorney Laux, asserting her Fifth Amendment privilege against self-incrimination, did not participate in the OCI proceedings. Attorney Laux's insurance license was revoked and she was ordered to pay restitution to M.F. in the amount of $584,995.02, as well as a forfeiture of $32,000 to the State of Wisconsin and an additional restitutionary forfeiture of $600,000 to the State of Wisconsin. To date, Attorney Laux has apparently not provided the ordered restitution to M.F.

¶23 Attorney Laux does not contest that she engaged in the following misconduct:

- By transferring $2,184,125.03 of her clients' money into the HMFF account at U.S. Bank, an account over which she had sole control, without the clients' consent or authorization, Attorney Laux violated SCR 20:1.15(j)(l).[4]

- On March 5, 2013, by making two $250,000 withdrawals of the clients' funds from an HMFF checking account to herself via cashier's checks, Attorney Laux violated SCR 20:1.15(j)(1) and SCR 20:8.4(c).[5]

- On June 12, 2013, by appearing at a U.S. Bank branch in Greendale, Wisconsin and withdrawing for personal enrichment $84,172.79 (via cashier's check) of the client's funds from an HMFF checking account, zeroing out the account, Attorney Laux violated SCR 20:1.15(j)(1) and SCR 20:8.4(c).

- On June 12, 2013, by making a cash withdrawal of $822.23 of the client's funds for personal enrichment from an HMFF money market account at a U.S. Bank branch in

---

[4] SCR 20:1.15(j)(1) provides that "[a] lawyer shall hold in trust, separate from the lawyer's own funds or property, those funds or that property of clients or 3rd parties that are in the lawyer's possession when acting in a fiduciary capacity that directly arises in the course of, or as a result of, a lawyer-client relationship or by appointment of a court."

[5] SCR 20:8.4(c) provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

Mequon, Wisconsin, zeroing out the account, Attorney Laux violated SCR 20:1.15(j)(1) and SCR 20:8.4(c).

- By making multiple representations to her client regarding her purchase of annuities on the client's behalf, when at the time no annuities had been purchased, Attorney Laux violated SCR 20:8.4(c).

- By submitting forged documents to purchase annuities on behalf of M.F. a few days after she confessed her fraud to M.F. and M.F.'s son, Attorney Laux violated SCR 20:8.4(c).

Matter of R.F. and Y.F.

¶24 The amended complaint also alleges eight counts of misconduct committed in connection with Attorney Laux's representation of R.F. and Y.F.

¶25 In 2009 or 2010, Attorney Laux purchased Family Foundation of Midwest (FFM), an estate planning company that used targeted mailing to invite certain people to free educational seminars about estate planning. Attorney Laux had prepared documents for FFM clients and given educational presentations at monthly seminars. Attorney Laux renamed the company Family Foundation Planning (FFP) and represented FFP as a nonprofit organization. FFP referred its legal work to Attorney Laux's own law firm, Laux Law LLC (Laux Law).

¶26 In 2010, R.F. and Y.F. attended a FFP seminar, then met with Attorney Laux to discuss their estate planning needs. The clients entered into a one-year "Patronship Agreement" with FFP for a fee of $4,250. The agreement entitled the clients to

10

basic and advanced estate planning documents, as well as other benefits, to be prepared by licensed attorneys retained by FFP. There was no written fee agreement explaining the basis or the rate of Laux Law's legal fees. Attorney Laux did not have an IOLTA account and did not deposit the clients' advance fees in trust.

¶27 Attorney Laux made a number of errors preparing estate planning documents for R.F. and Y.F. She repeatedly miscalculated the percentages of the estate that various beneficiaries were to receive. The trust documents drafted by Attorney Laux contained many significant drafting errors, including failing to properly identify the scholarship fund established in memory of the clients' daughter. Attorney Laux also created a "Transition Trust" for these clients, a document which potentially placed the clients in a devastating financial position, depriving them of all their assets. She was difficult to reach and sent legal documents to the wrong recipients. Eventually, R.F. and Y.F. terminated Attorney Laux's representation and retained another attorney to redo their estate plan.

¶28 During the OLR's ensuing investigation into Attorney Laux's conduct, Attorney Laux told the district committee that she used vague terms in the estate documents because the clients did not know the name of the organization to which they wanted to leave their property and other entities were not yet established. This was not true. Attorney Laux also failed to produce documents requested by the OLR.

11

¶29 Attorney Laux does not contest that she engaged in the following misconduct in this matter:

- By entering into a business entity known as FFP that provided estate planning and other legal services to clients, where the entity held itself out as a not-for-profit corporation and the partners in the entity were nonlawyers, Attorney Laux violated SCR 20:5.4(b).[6]

- Having received legal fees in excess of $1,000, including advanced fees, by failing to enter into a written fee agreement that clearly explained the basis of her fees, Attorney Laux violated SCR 20:1.5(b)(1) and (2).[7]

---

[6] SCR 20:5.4(b) provides that "[a] lawyer shall not form a partnership with a nonlawyer if any of the activities of the partnership consist of the practice of law."

[7] SCR 20:1.5(b)(1) and (2) provide:

(1) The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client in writing, before or within a reasonable time after commencing the representation, except when the lawyer will charge a regularly represented client on the same basis or rate as in the past. If it is reasonably foreseeable that the total cost of representation to the client, including attorney's fees, will be $1000 or less, the communication may be oral or in writing. Any changes in the basis or rate of the fee or expenses shall also be communicated in writing to the client.

(2) If the total cost of representation to the client, including attorney's fees, is more than $1000, the purpose and effect of any retainer or advance fee that is paid to the lawyer shall be communicated in writing.

- By failing to hold advance fees in a trust account, without complying with the requirements of SCR 20:1.15(b)(4m), Attorney Laux violated SCR 20:1.15(b)(4).[8]

- By failing to properly draft estate documents and by failing to provide appropriate estate planning advice, while holding herself out as an estate expert, Attorney Laux violated SCR 20:1.1.[9]

- By preparing a Transition Trust for the clients and by failing to explain the consequences of such a trust, which was outside the purposes for which the clients hired her, Attorney Laux violated SCR 20:1.2(a).[10]

---

[8] SCR 20:1.15(b)(4) provides that, "[e]xcept as provided in par. (4m), unearned fees and advanced payments of fees shall be held in trust until earned by the lawyer, and withdrawn pursuant to sub. (g). Funds advanced by a client or 3rd party for payment of costs shall be held in trust until the costs are incurred."

[9] SCR 20:1.1 provides that "[a] lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

[10] SCR 20:1.2(a) provides:

Subject to pars. (c) and (d), a lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by SCR 20:1.4, shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to settle a matter. In a criminal case or any proceeding that could result in deprivation of liberty, the lawyer

(continued)

13

- By failing to provide promised revisions or proposed language changes to documents related to the clients' desire to leave property to a not-for-profit corporation, Attorney Laux violated SCR 20:1.3.[11]

- By failing to communicate with her clients, including failing to keep the clients informed and failing to respond to their reasonable requests for information, Attorney Laux violated SCR 20:1.4(a)(3) and (4).[12]

- By making inconsistent statements to the OLR's district committee investigators and by failing to produce requested documents to the OLR, Attorney Laux violated SCR 22.03(6),[13] enforced via SCR 20:8.4(h).[14]

---

shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

[11] SCR 20:1.3 provides that "[a] lawyer shall act with reasonable diligence and promptness in representing a client."

[12] SCR 20:1.4(a)(3) and (4) provide that a lawyer shall "keep the client reasonably informed about the status of the matter" and "promptly comply with reasonable requests by the client for information."

[13] SCR 22.03(6) provides that, "[i]n the course of the investigation, the respondent's wilful failure to provide relevant information, to answer questions fully, or to furnish documents and the respondent's misrepresentation in a disclosure are misconduct, regardless of the merits of the matters asserted in the grievance."

14

Matter of S.C.

¶30 The amended complaint also alleges three counts of misconduct pertaining to Attorney Laux's representation of S.C.

¶31 In August 2007, S.C. was placed in a nursing home due to her declining physical and mental health. Her sister-in-law had a general power of attorney for S.C. While in the nursing home, S.C. was contacted by a representative of FFM to do some estate planning. Attorney Laux met with S.C. at the nursing home. At that time, S.C.'s estate had a value of approximately $500,000. There were four beneficiaries to the estate, including J.C., the client's brother.

¶32 On August 9, 2007, S.C. signed a membership agreement with FFM for estate planning documents and paid FFM a total fee of $3,000. There was no written fee agreement. Attorney Laux drafted a trust document for S.C., relying on a spreadsheet and information gathered and prepared by a FFM representative. Attorney Laux also initially set up a LLC, which was never funded or closed. In addition, Attorney Laux recommended advanced estate planning in the form of a Transition Trust to protect S.C.'s assets. In 2008, when Attorney Laux left her previous firm, Kitzke & Associates, and formed Laux Law, S.C.

---

[14] SCR 20:8.4(h) provides that it is professional misconduct for a lawyer to "fail to cooperate in the investigation of a grievance filed with the office of lawyer regulation as required by SCR 21.15(4), SCR 22.001(9)(b), SCR 22.03(2), SCR 22.03(6), or SCR 22.04(1)."

apparently became a client of Laux Law without her specific consent and without documentation.

¶33 In August 2008, a Transition Trust was drafted by Attorney Laux and signed by S.C. At the time the Transition Trust was signed, there were questions about S.C.'s competence. In November 2011, S.C. passed away. At the time, her estate was worth approximately $100,000.

¶34 On June 18, 2012, Attorney Laux sent a letter to the Trust beneficiaries, including J.C., attaching a Trust Receipt and Release requesting that J.C. "accept and approve the attached accounting of receipts and disbursements for the Trust" in order to receive his share of the Trust proceeds. However, no accounting was attached to the letter.

¶35 Frustrated by Attorney Laux's lack of response to his requests for an accounting, J.C. contacted another attorney. In August 2012, Attorney Laux sent the new attorney a letter, enclosing a spreadsheet of expenses incurred at the time of S.C.'s death. In October 2012, Attorney Laux sent the attorney bank statements from November 2011 through July 2012. Attorney Laux did not, however, provide an accounting relating to the time period prior to S.C.'s death.

¶36 J.C. eventually filed a grievance with the OLR against Attorney Laux. During the ensuing grievance investigation, Attorney Laux failed to produce requested documents and made misrepresentations to the OLR's district committee members.

¶37 Attorney Laux does not contest that she engaged in the following misconduct in this matter:

16

- By entering into a business entity known as FFP that provided estate planning and other legal services to clients, where the entity held itself out as a not-for-profit corporation and the partners in the entity were nonlawyers, Attorney Laux violated SCR 20:5.4(b).

- By failing to hold advance fees in a trust account, without complying with any of the requirements of SCR 20:1.15(b)(4m), Attorney Laux violated SCR 20:1.15(b)(4).

- By making inconsistent statements to the OLR's district committee investigators and by failing to produce requested documents to the OLR, Attorney Laux violated SCR 22.03(6), enforced via SCR 20:8.4(h).

<u>Matter of A.C. and J.C.</u>

¶38 The amended complaint also alleges six counts of misconduct committed in connection with Attorney Laux's representation of A.C. and J.C.

¶39 In late fall 2007, A.C. and J.C. responded to a FFM advertisement for a free luncheon near West Bend, Wisconsin. J.C. was beginning to exhibit signs of dementia and the couple sought assistance protecting their assets. On November 13, 2007, A.C. and J.C. entered into a membership agreement with FFM and paid $1,600 for basic estate planning. No fee agreement was executed.

¶40 On January 8, 2008, A.C. and J.C. signed forms and documents including a marital property agreement, a family trust, last wills and testaments, and powers of attorney.

17

¶41 In 2008, when Attorney Laux formed Laux Law, A.C. and J.C. apparently became clients of Laux Law without their specific consent and without documentation.

¶42 As J.C.'s health worsened, A.C. consulted with Attorney Laux and FFM and was told she now needed advanced estate planning. On June 3, 2009, A.C., using a power of attorney for her husband, entered into another membership agreement with FFM for a payment of $3,500. There was no written fee agreement. Attorney Laux also charged the clients additional sums for work Attorney Laux purportedly performed during the representation. Attorney Laux has not produced to the clients or to the OLR either a fee agreement or any billing records for her work.

¶43 In June 2009, J.C. was diagnosed with Alzheimer's disease and placed in a private assisted living facility. Attorney Laux had A.C. sign numerous documents transferring the clients' assets between themselves and then into the a Transition Trust, utilizing a "Spousal Refusal."

¶44 It is not disputed here that "Spousal Impoverishment" would have been the preferable option given the size of the clients' estate, which was under $300,000, and their limited annual income. Spousal Impoverishment would have allowed A.C. to retain her husband's income and most, if not all, of the couple's assets. Under Spousal Refusal, A.C. was unable to collect her husband's social security checks. A.C. also signed a document which explained the difference between Spousal

Refusal and Spousal Impoverishment. However, Attorney Laux did not explain the differences to A.C.

¶45 Because Attorney Laux elected Spousal Refusal, J.C. had a difficult time having his application for Medicaid and Title 19 accepted, making the clients ineligible for Medicare and financially responsible for all of J.C.'s care at the assisted living facility. On June 15, 2010, J.C. was moved to a state institution. In an effort to "undo" the severe monetary predicament that A.C. was placed in due to Attorney Laux's decision to use Spousal Refusal, another attorney assumed responsibility for the case and unsuccessfully attempted to have the initial Medicare disqualification ruling overturned on appeal.

¶46 While attempting to get J.C. accepted on Title 19 and Medicaid, the couple's assets were depleting at a rate of $9,000 per month for J.C.'s care. The couple's assets eventually dwindled down to $100,000. After A.C. paid for residential care from June 2010 through August 2010, Attorney Laux advised A.C. to stop paying the care facility because her husband would be eligible for Title 19 and benefits would take effect retroactively.

¶47 However, Title 19 benefits were not available to J.C. until February 2011. Consequently, the couple was responsible for $50,000 worth of unpaid medical bills, plus interest and penalties. Attorney Laux did not attempt to negotiate with the care facility, and instead recommended that the couple pay the entire amount due. During Attorney Laux's representation, A.C.

19

only spoke to Attorney Laux on two or three occasions, and she had a difficult time getting Attorney Laux to respond to her. There were lengthy periods of time during which the clients received no communication or status updates.  Eventually, the clients terminated their relationship with Attorney Laux and hired another attorney to represent them.  The new attorney negotiated a settlement with the care facility so that the clients would only have to pay the outstanding bills, and the interest and penalties were waived.

¶48 During the ensuing OLR grievance investigation, Attorney Laux failed to produce certain documents, despite repeated requests.  During the course of the investigation, Attorney Laux made misrepresentations to the OLR's district committee members, including, but not limited to, misrepresentations related to her reasoning for choosing Spousal Refusal, that A.C. and J.C. were not clients of Laux Law, and misrepresentations related to her conversations with the clients.

¶49 Attorney Laux does not contest that she engaged in the following misconduct in this matter:

- By entering into a business entity known as FFP that provided estate planning and other legal services to clients, where the entity held itself out as a not-for-profit corporation and the partners in the entity were nonlawyers, Attorney Laux violated SCR 20:5.4(b).

- By failing to execute a written fee agreement with her clients, where her attorneys fees totaled at least $4,100

20

and advanced fees exceeded $1,000, Attorney Laux violated SCR 20:1.5(b)(1) and (2).

- By failing to communicate with her clients, including failing to respond to reasonable requests for information, Attorney Laux violated SCR 20:1.4(a)(3) and (4).

- By failing to provide appropriate information regarding applying for a Spousal Refusal as part of her clients' estate plan, while holding herself out as an expert in estate planning, Attorney Laux violated SCR 20:1.1.

- By failing to explain the difference between Spousal Impoverishment and Spousal Refusal and failing to explain the benefits and detriments of either estate planning action, Attorney Laux violated SCR 20:1.4(b).[15]

- By making inconsistent statements to the OLR's district committee investigators and by failing to produce requested documents to the OLR, Attorney Laux violated SCR 22.03(6), enforced via SCR 20:8.4(h).

Pending Grievances

¶50 In addition, when Attorney Laux filed her petition for consensual license revocation, the OLR was investigating 28 additional allegations of misconduct.

---

[15] SCR 20:1.4(b) provides that "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

21

¶51 Several attorneys who worked with Attorney Laux filed grievances, including attorneys of Associated Bank, who alleged that Attorney Laux failed to account for funds, sent them false bank statements, drafted documents that were personally advantageous to Attorney Laux without securing a conflict waiver, and misappropriated funds. A recent law graduate who worked briefly for Attorney Laux also expressed concern, in writing, about Attorney Laux's practices.

¶52 The pending grievances are numerous. They include an allegation that Attorney Laux misappropriated $1,654,140.72 from a client in the matter of the C.V.J. Trust. This misconduct lead to a lawsuit in Milwaukee County in which the plaintiffs allege that Attorney Laux engaged in conversion, theft, fraud, misrepresentation, breach of fiduciary duty, breach of contract, unjust enrichment, negligence, fraudulent transfers, and conspiracy.

¶53 Several clients have alleged that they paid Attorney Laux to prepare a transition trust or revocable trust and later learned that the documents she prepared did not meet their objectives and, indeed, would or did cause them serious financial problems.

¶54 Other clients allege that Attorney Laux provided them incorrect legal guidance, failed to follow through on promised legal work, and failed to purchase annuities, as promised; many also indicate that Attorney Laux was difficult to reach. All told, the pending grievances involve possible violations of the following supreme court rules: 20:1.1 (23 matters), 20:1.2(a)

22

(two matters), 20:1.3 (19 matters), 20:1.4(a) and/or (b) (19 matters), 20:1.5(a)[16] (16 matters), 20:1.7(a)[17] (two matters),

---

[16] SCR 20:1.5(a) provides:

A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

[17] SCR 20:1.7(a) provides:

Except as provided in par. (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(continued)

23

20:1.8(a)[18] (two matters), 20:1.15 (four matters), 20:1.16(d)[19] (two matters), 20:8.4(b)[20] (two matters), and 20:8.4(c) (26 matters).

---

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

[18] SCR 20:1.8(a) provides:

A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

[19] SCR 20:1.16(d) provides:

Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. The lawyer may retain papers

(continued)

¶55 When reviewing a report and recommendation in an attorney disciplinary proceeding, we affirm a referee's findings of fact unless they are found to be clearly erroneous. In re Disciplinary Proceedings Against Inglimo, 2007 WI 126, ¶5, 305 Wis. 2d 71, 740 N.W.2d 125. We review the referee's conclusions of law, however, on a de novo basis. Id. We determine the appropriate level of discipline given the particular facts of each case, independent of the referee's recommendation, but benefitting from it. In re Disciplinary Proceedings Against Widule, 2003 WI 34, ¶44, 261 Wis. 2d 45, 660 N.W.2d 686.

¶56 Attorney Laux's petition for consensual revocation states that she cannot successfully defend against the allegations of professional misconduct set forth in both the amended complaint and the summary of the matters being investigated. Her petition asserts that she is seeking consensual revocation freely, voluntarily, and knowingly and that restitution should be imposed. She states that she understands she is giving up her right to contest the OLR's allegations. She has counsel in this matter. The OLR supports Attorney Laux's petition. The referee determined, based on

relating to the client to the extent permitted by other law.

[20] SCR 20:8.4(b) provides that it is professional misconduct for a lawyer to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects."

Attorney Laux's petition and the OLR's response, by clear, satisfactory, and convincing evidence, that Attorney Laux has engaged in very serious misconduct, and he recommends that we accept the petition, order restitution, and revoke Attorney Laux's license to practice law.

¶57 Attorney Laux's misconduct is egregious and warrants the severest level of discipline that we impose, namely, the revocation of her license to practice law in Wisconsin. Anything less than a revocation of her license to practice law would unduly depreciate the seriousness of her misconduct. We agree with the referee's recommendation that we accept Attorney Laux's petition for consensual license revocation.

¶58 We now consider restitution. The referee's recommendations for restitution are consistent with the amended complaint, Attorney Laux's petition, and the OLR's response. We order Attorney Laux to pay $584,995.02 in restitution to M.F., less $150,000 paid to M.F. by the Wisconsin Lawyers' Fund for Client Protection (Fund),[21] and she shall also pay restitution to

---

[21] Attorney Laux's petition for consensual license revocation at paragraph 7 states that she should be ordered to make the appropriate restitution in the amount of "$398,995.02 to [M.F.] ($584,995.02 - $150,000 paid by the Fund), less any funds already provided by me to [M.F.] in restitution." This does not add up. $584,995.02 - $150,000.00 = $434,995.02. This appears to be a math error that is repeated in the referee's report. The record reflects that M.F. is entitled to restitution in the amount of $584,995.02 and to the extent the Fund has paid M.F. a portion of her losses, Attorney Laux should reimburse the Fund.

26

the Fund for the $150,000 attributable to the Fund's approval and payment on M.F.'s claim.

¶59 The referee further recommends that we order restitution in seven of the 28 grievances under investigation at the time of the petition: $4,000 to R.R. and C.R.; $1,500 to T.M.; $22,420 to D.B.; $4,000 to R.B. and J.B.; $2,100 to M.B.; $3,500 to R.G. and S.G.; and 4,000 to K.S. and L.C.S.

¶60 The OLR has advised the court that it does not seek restitution in a number of the client matters implicated in this proceeding.[22] Although the recommended restitution in this case exceeds the staggering sum of $590,000, it is readily apparent that Attorney Laux has failed to account for significantly more money from a number of other clients who were victimized by her egregious misconduct.

¶61 Two of the grievances are also part of a criminal proceeding pending against Attorney Laux in federal court. If Attorney Laux is ordered to pay restitution by the U.S. District Court in the criminal proceeding, Attorney Laux will be directed to pay that restitution amount.

¶62 In several matters, however, the OLR advises this court that its investigation to date has not revealed a

---

[22] The OLR's policy is to seek restitution only under the following circumstances: (1) there is a reasonably ascertainable amount; (2) the funds to be restored were in the respondent lawyer's direct control; (3) the funds to be restored do not constitute incidental or consequential damages; and (4) the grievant's or respondent's rights in a collateral proceeding will not likely be prejudiced.

27

reasonably ascertainable amount, if any, of restitution to seek. In other cases, the OLR indicates that Attorney Laux performed some work and, again, the OLR's investigation to date does not provide a reasonably ascertainable amount, if any, of restitution to seek.

¶63 It is imperative that we revoke Attorney Laux's law license now, so we will accede to the OLR's restitution recommendations. However, we emphasize that, prior to any reinstatement of Attorney Laux's Wisconsin law license, we will revisit the issue of restitution. See SCR 22.29(4m) (any attorney petitioning for reinstatement from a disciplinary suspension of six months or more is required to allege and demonstrate that the attorney "has made restitution to or settled all claims of persons injured or harmed by [the attorney's] misconduct . . . or, if not, the [attorney's] explanation of the failure or inability to do so").

¶64 Indeed, Attorney Laux, herself, acknowledges in her petition that, should she ever seek reinstatement, as a condition of any future reinstatement, pursuant to SCR 22.29(4m), she must prove that she has made full restitution to and settled all claims of persons harmed by the alleged misconduct, including that she has satisfied any restitution ordered as a result of any civil or criminal charges filed against her.

¶65 Finally, we further determine that Attorney Laux should be required to pay the full costs of this proceeding. SCR 22.24(1m).

28

¶66 IT IS ORDERED that the license of Sarah E.K. Laux to practice law in Wisconsin is revoked, effective the date of this order.

¶67 IT IS FURTHER ORDERED that Sarah E.K. Laux make restitution in the following amounts and client matters:

- $584,995.02, less $150,000 paid by the Wisconsin Lawyers' Fund for Client Protection, to M.F.

- $150,000 to the Wisconsin Lawyers' Fund for Client Protection, attributable to the Fund's payment on M.F.'s claim

- $4,000 to R.R. and C.R.

- $1,500 to T.M.

- $22,420 to D.B.

- $4,000 to R.B. and J.B.

- $2,100 to M.B.

- $3,500 to R.G. and S.G.

- $4,000 to K.S. and L.C.S.

¶68 IT IS FURTHER ORDERED that Sarah E.K. Laux shall pay restitution consistent with any final monetary order or judgment issued in any civil or criminal case filed against her in connection with the misconduct alleged herein.

¶69 IT IS FURTHER ORDERED that within 60 days of the date of this order, Sarah E.K. Laux shall pay to the Office of Lawyer Regulation the costs of this proceeding.

¶70 IT IS FURTHER ORDERED that the restitution specified above is to be completed prior to paying costs to the Office of Lawyer Regulation.

29

¶71  IT IS FURTHER ORDERED that, to the extent she has not already done so, Sarah E.K. Laux shall comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been revoked.

¶72  PATIENCE DRAKE ROGGENSACK, C.J., did not participate.